**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **BARRY BOYD, DERIVATIVELY ON BEHALF OF NOMINAL DEFENDANT, CYPRESS WOOD & LUMBER, LLC,** | |
| **PLAINTIFF,** | **CIVIL ACTION NO. 3:25-cv-00778** |
| **V.** | |
| **BRETT PRICE, BRANDI PRICE, & PRICE'S WOOD PRODUCTS, LLC,** | **JUDGE: John W. deGravelles** |
| **DEFENDANTS,** | **MAGISTRATE: Richard L. Bourgeois, Jr.** |
| **- AND –** | |
| **CYPRESS WOOD & LUMBER, LLC,** | |
| **NOMINAL DEFENDANT.** | |

## PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiff Barry Boyd ("Boyd"), derivatively on behalf of Cypress Wood & Lumber, LLC ("CWL"), submits this Supplemental Memorandum in support of its Motion for Preliminary Injunction pursuant to Fed. R. Civ. P. 65 and LR 5(b). Limited discovery has confirmed that Defendants Brett Price, Brandi Price, and Price's Wood Products, LLC ("PWP") are engaging in ongoing self-dealing, diversion of corporate opportunities, and misappropriation of CWL's core assets—including its trademark rights, domain name, and sawmills. Absent immediate relief, CWL faces continuing loss of control over essential business assets, erosion of goodwill, and further

financial harm.

CWL seeks the following narrowly tailored relief:

(1) Immediate restoration of the domain name www.cypresswood.net and related accounts to CWL;

(2) Prohibition on further alteration of CWL's intangible assets;

(3) Return of the circular and band sawmills; and

(4) Additional equitable relief necessary to preserve CWL's assets.

## FACTUAL BACKGROUND

Boyd and Defendant Brett Price ("Price") each bring decades of experience in the heavy equipment, land clearing, logging, transportation, and wood-products industries. (*See* **Exhibit 1**, Decl. of Barry Boyd ¶ 4). In February 2020, Price contacted Boyd and began discussions about acquiring CWL from David Williams, who was CWL's sole owner at the time. (**Exhibit 2**, **Deposition of Barry Boyd** 24:11-18, January 13, 2026). Price was seeking a partner to help fund the $[redacted] purchase price and needed an infusion of capital and access to a strong credit line to finance equipment purchases for CWL's operations. (Boyd Depo. 26:22-25; 27:1-17). Critically, in 2020, Price's companies posted a net loss of nearly [redacted]. (Boyd Depo. 275:10-15; **Exhibit 3**, Boyd_Supp 1, 13, 21, 46, 63, 88). Price had previously approached at least two financial institutions but was unable to obtain the financing he required. (**Exhibit 4**, **Deposition of PWP** 58:9-17, January 15, 2026). At that time, Boyd was operating a profitable business, Louisiana Wood Products ("LWP"), and had access to loans and lines of credit—resources Price sought to leverage. (Boyd Depo. 26:22-17).

Boyd and Price agreed to form a new business, Boyd Price Acquisitions, to purchase CWL. (Boyd Depo 28:18-23). The partners intended Boyd Price Acquisitions to combine the following:

Price's two companies, PWP and Big Dawg Industries ("BDI"); Boyd's company, LWP; and CWL once it was acquired. (Boyd Depo 36:7-12; 21-23). In furtherance of combining operations, Boyd obtained several loans to purchase equipment that he would otherwise have no need for but for the burgeoning business venture with Price. (**Exhibit 5**, Boyd_Supp 164-171) (LWP's purchase of equipment on which BDI was delinquent in payments). By way of one example, LWP secured a [redacted] line of credit to purchase logging equipment on May 19, 2020, which pre-dates the acquisition of CWL (**Exhibit 6**, Boyd_ 2457; PWP Depo. 77:3-24).

On June 17, 2020, Williams and Price signed an Agreement to Purchase and Sell Membership Interests designed to sell "all outstanding membership interest of CWL to Big Dawg Industries, LLC." (**Exhibit 7**, BDI_255-267). As a condition precedent to the transfer of membership interests, Williams contracted with a large Iberville Parish landowner ("AWS") to sell all of CWL's tangible assets (land, buildings, equipment, and certain inventory), along with the tangible assets of Specialty Lumber Services, LLC (a CWL subsidiary), to AWS (the "Asset Sale"). The Asset Sale did not include CWL's intangible property, including the domain cypresswood.net. (**Exhibit 8**, BDI_248-251). The sale price for the transfer of CWL membership interests to BDI was ten dollars ($10), which Boyd paid in cash. (Boyd Depo. 49:13-22).

That same day, Williams executed a corporate resolution approving the sale of CWL membership interests to BDI. (**Exhibit 9**, BDI_254). Also on June 17, 2020, Brett and Brandi Price executed a corporate resolution transferring 100% of CWL's membership interests to Brett Price. (**Exhibit 10**, BDI_252-253).

Following its acquisition by Boyd and Price, CWL no longer owned any real property and owned only two forklifts and a quantity of lumber inventory. However, CWL retained its domain name, goodwill, and operating identity. (Boyd Depo. 52:18-25; 53:1-7). The only valuable

property that remained with CWL was the domain cypresswood.net and CWL's long-standing operating history and goodwill. Since neither the Asset Sale nor the membership-interest transfer to BDI included the cypresswood.net domain, it remained CWL's property. Throughout this period, CWL continued to use cypresswood.net exclusively for its business operations. CWL retained and paid an outside IT vendor to manage its online presence, including website maintenance and DNS configuration. The IT vendor's access was provided solely for CWL's benefit and at CWL's expense.

Following the Asset Sale, Boyd's primary responsibility was to finance CWL through his company, LWP. (Boyd Depo. 66:22–24; 65:4–10). In practice, LWP paid for CWL's equipment purchases even though the equipment was titled in CWL's name. (Boyd Depo. 78:18–22; 100:18–25; 101:1–2; 101:21–25; 102:21–25; 103:1; 110:24–25; 111:1–3; 112:21–25; 113:1–2). Using Boyd's credit and funds, CWL began acquiring inventory and equipment and hiring personnel. CWL also continued operating under the domain cypresswood.net, taking orders from and communicating with customers throughout the United States.

Price, by contrast, served as CWL's manager, placing him in direct control of CWL's operations and financial decision-making. (Exhibit 1, ¶ 6). Brett Price's wife, Brandi Price, served as CWL's bookkeeper and managed CWL's financial accounts, including accounts payable and receivable, bank reconciliations, and the maintenance of CWL's financial records. (*Id.* ¶ 7). Brandi Price also became LPW's bookkeeper from late 2020 through August 2023, and continues to serve as bookkeeper for PWP and BDI. (**Exhibit 11**, Deposition of Brandi Price 46:2-22, January 16, 2026).

For the first two years, CWL performed well: in 2021, CWL generated approximately [redacted] in gross sales; in 2022, approximately [redacted]. By the first quarter of 2023, however,

CWL reported only [redacted] in gross sales. (Boyd Depo. 116:7-23; 117:1-5). In February 2023, LWP obtained a line of credit and transferred [redacted] to PWP to pay for logs that Price could not afford. (Boyd Depo. 123:19–25; 124:1–4). In July 2023, Brett Price advised Boyd that CWL had earned [redacted] in profit. (Boyd Depo. 122:19–25; 123:1–4). In short, CWL's sales dropped approximately [redacted] from 2022 to 2023. (**Exhibit 12**, QB_1,3,5, 1052).

When the expected revenue did not materialize the next year, Boyd began to question CWL's financial records. The volume of sales generated material revenue—revenue that, under ordinary circumstances, should have translated into meaningful profits. (Exhibit 1, ¶ 11). When that did not occur, Boyd—acting for CWL—engaged Susan Fortenberry, a consultant with substantial operations and accounting experience, to assess CWL's operational performance and financial condition. (*Id.* at ¶ 11). Fortenberry could not complete that assessment without access to CWL's records. Defendants did not simply fail to assist; they actively interfered. (*Id.* ¶ 12). Upon learning of Fortenberry's retention, Price told Boyd that the engagement would not be allowed. (*Id.* ¶ 13). Defendants then withheld company information and financial data and denied Fortenberry the access necessary to perform her evaluation. (*Id.*).

By October 2023, given the limited and delayed disclosures, Boyd's concerns escalated regarding the reliability of the information Defendants had provided and the possibility of financial wrongdoing. (*Id.* ¶ 18). With counsel's assistance, he initiated an investigation into CWL's finances. (*Id.*). That investigation identified concrete instances of conduct consistent with breaches of fiduciary duty, self-dealing, and the diversion of CWL opportunities—conduct that has materially harmed CWL. (*Id.* ¶ 19).

During depositions, Brett and Brandi Price repeatedly gave evasive answers, often deflecting responsibility to other individuals to explain financial irregularities. They also displayed

a remarkable lack of knowledge when questioned about CWL's documents and operations. At least fourteen times during his deposition, Price testified that he was not "sure" or could not recall key facts, including dates and events, equipment owned by PWP, whether his company submitted loan applications related to the CWL transaction, and even the names of employees who handled documents from five years earlier. (*See*, *e.g.*, PWP Depo. 21:16; 22:11; 26:9-10; 42:2-3; 68:23-25).

Further, on January 15, 2026, Price produced—apparently for the first time—a document reflecting that, in October 2025, he purchased for $1 million the real property and equipment that CWL had been leasing from AWS since the Asset Sale. (PWP Depo. 245:13-247:20 and **Exhibit 13**). The instrument filed in Iberville Parish had not been produced in response to discovery requests, and the details of the transaction remain unknown, other than that Bank of Montgomery financed the loan. (*Id.*). Given the lack of transparency, serious concern exists that CWL and its assets—including the sawmills—may have been pledged as collateral for the loan used to acquire that property. Should Price default, the sawmills risk seizure by the lender, and CWL could lose its most valuable tangible property. A preliminary injunction preserving the status quo and notifying the lender of this lawsuit is vital.

## ARGUMENT AND AUTHORITIES

### I. Legal Standard

A preliminary injunction requires proof of: (1) likelihood of success on the merits; (2) substantial threat of irreparable injury; (3) balance of harms favoring the movant; and (4) consistency with the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Rule 65 is intended to preserve the status quo where meaningful relief would otherwise be impossible. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). As discussed below, CWL meets all four

factors for the following claims: breach of fiduciary duty, trademark infringement, violation of the Computer Fraud and Abuse Act ("CFAA"), and violation of the Louisiana Unfair Trade Practices Act ("LUTPA"), any one of which would singularly justify enjoining Defendants as requested.

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Fiduciary Duty

To state a claim for breach of fiduciary duty under Louisiana law, a plaintiff must show the "(1) existence of a fiduciary duty, (2) a violation of that duty by the fiduciary, and (3) damages resulting from the violation." *Schott v. Massengale*, No. 18-759-JWD-RLB, 2019 U.S. Dist. LEXIS 166736, at *24 (M.D. La. Sep. 27, 2019) (internal quotes omitted). Whether a fiduciary duty exists, and the scope of that duty, depends on the parties' relationship and the specific facts. A fiduciary relationship exists when one person places special trust or confidence in another, and that other person undertakes to act primarily for the benefit of the first in a particular matter. *Omega Ctr. for Pain Mgmt., L.L.C. v. Omega Inst. of Health, Inc.*, 07-558 (La. App. 5 Cir. 12/27/07), 975 So. 2d 48, 51-52. Neither Brett nor Brandi Price have denied owing fiduciary duties to CWL.

#### 1. Brett Price, as a Managing Member, Owed CWL a Fiduciary Duty.

Louisiana Revised Statute § 12:1314(A)(1) imposes upon LLC members and managers duties of loyalty and care. Managers must "discharge his duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances." *Id.* The Fifth Circuit has long recognized that fiduciaries may not exploit their positions for personal gain at the expense of the entity. *See In re Safety Intl., Inc.*, 775 F2d 660, 662 (5th Cir 1985). As an officer, manager, and fifty-percent member of CWL, Brett Price was obligated to act in CWL's best interests and to preserve CWL's property and assets.

**2. Brandi Price, as a Mandatory to CWL, Owed CWL a Fiduciary Duty.**

Brandi Price, as CWL's bookkeeper, managed CWL's financial accounts, including accounts payable and receivable, bank reconciliations, and CWL's financial records. Exhibit 1, at ¶ 7. Acting at the direction of the managing member, Brett Price, and as an authorized agent on CWL's behalf, she was a mandatory of CWL. *Id.*; La. C.C. art. 2989. Her control over CWL's financial activities gave rise to fiduciary obligations of good faith, loyalty, and candor to the company. *See id.*

**3. The Price Defendants Breached Their Fiduciary Duties to CWL.**

The Price Defendants' conduct involves a knowing and culpable violation of their fiduciary obligations, the absence of good faith, and a reckless disregard for their duties to CWL and its members. The following conduct, while not exclusive, is sufficient to establish a substantial likelihood of success on the breach of fiduciary duty claims:

*Misappropriation and Concealment of Corporate Assets*:

The evidence will show that both Brett and Brandi Price fabricated and backdated invoices to disguise unauthorized transfers from CWL's bank accounts. (Exhibit 1, at ¶ 20). For example, PWP issued a line-item invoice [redacted] on last day of the year for "kiln drying" without any backup to justify the charge. (**Exhibit 14**, PWP_1969) Additionally, an email from Brandy Rivers to Larry Lanclos shows that Defendants directed CWL's accountant to alter invoices by increasing the amounts. (Exhibit 1-A). Moreover, the accounting records are replete with examples of questionable accounting, having myriad "general journal" entries transferring money out of CWL to PWP or BDI without explanation or backup. (*See*, *e.g.*, **Exhibit 15**, PWP_ 2405) (transfer of [redacted] from CWL to PWP). PWP would eliminate its debts owed to CWL by general journal entries, intentionally making it nearly impossible to trace the flow of cash. (*See, e.g.*, **Exhibit 16**,

QB_107; 603) (eliminating $[redacted] of debt owed to CWL).

Defendants also placed friends and family members on CWL's payroll for services never performed and gave these individuals unfettered access to CWL's credit. (Exhibit 1 at ¶ 21). By diverting CWL labor and property to strengthen a competing business, Defendants violated their duties of loyalty to CWL.

*Conversion of CWL Resources to Competing Enterprises*: The Price Defendants exploited CWL's employees, infrastructure, and financial resources to operate Brett Price's separate business, PWP, without compensating CWL. (Exhibit 1 at ¶ 22). CWL funds were used to purchase and maintain equipment and sawmills titled in PWP's name and listed as PWP assets. (*Id.* ¶ 24). By doing so, the Price Defendants diverted CWL's property and labor to strengthen a competing business, in direct violation of their fiduciary duties of loyalty. (*Id.* ¶ 27).

More specifically, with respect to the sawmills, Defendants misappropriated a band sawmill and circular sawmill that were financed by CWL. (Boyd Depo. 166:14-25; 167:1-3; 242:17-24). CWL, LWP, and BDI paid for the labor to build the sawmills (Boyd Depo. 242:2-10). Accounting records show that when PWP took title on December 31, 2021, CWL recorded [redacted] in intercompany receivables from PWP representing costs CWL incurred and reallocated to PWP, including $[redacted] for the band sawmill project and [redacted] for the circular sawmill. (**Exhibit 17**, Boyd_22-23). Those same records reflect a [redacted] credit from CWL's "New Sawmill" account, representing the total value CWL invested in the sawmill projects at that time in 2021. (*Id.).* These entries confirm CWL funded the sawmills. In addition, in 2022, CWL wrote checks totaling [redacted] for materials and labor used for the sawmills, excluding credit card purchases (which are likely significant) and equipment-loan payments. (**Exhibit 18**, CWL Second Supp._1-110) (summary of bank statements and labor attributable to building of

sawmills).

At the time of the purported title transfer to PWP on December 31, 2021, CWL and LWP remained responsible for the debt while PWP took title without paying the expenses associated with the sawmill projects. Price conceded during his deposition that the majority of the equipment owned by and financed by CWL was for the building and/or operation of the sawmills. (PWP Depo. 202:24-25; 203:1-22). CWL is the true economic owner because CWL, LWP, and Boyd financed acquisition and construction, bore vendor obligations, and carried the sawmills on CWL's books. The December 31, 2021, transfer of title to PWP was executed without authorization, without consideration, and for the personal benefit Price and PWP.

Louisiana courts recognize that loss of control over unique property in which a party has a special interest constitutes irreparable harm supporting injunctive relief. *Bowie v. Young*, 2001 CA 0715 (La. App. 4 Cir.) Under La. C.C.P. art. 3601, an injunction is appropriate where the financing party risks permanent loss of the assets before adjudication. The conduct here also tracks the self-dealing and unauthorized diversion Louisiana law treats as fiduciary breaches: members who control LLC property may not use company assets for personal benefit without disclosure and consent. La. R.S. 12:1314. Courts have enjoined controlling members who transfer or encumber company assets without authority or exclude co-owners from access. *Hodge v. Strong Built Int'l, LLC*, 2013 CA 1497 (La. App. 1 Cir.) (injunction warranted where member diverted assets and excluded co-owner); *Samson v. Samuels*, 2017 CA 0003 (La. App. 4 Cir.) (self-dealing by controlling member supports injunctive relief). Here, Price transferred CWL-financed sawmills to an entity he controls and appears to have used the sawmills as collateral for a personal land purchase, while CWL and its member remain liable on equipment notes. These facts fall squarely within the fiduciary-breach framework Louisiana courts have found sufficient to justify a

preliminary injunction.

*Personal Use of CWL Funds:* QuickBooks entries show CWL's American Express card was used for PWP purchases that PWP did not reimburse. (R. Doc. 11-4). Defendants also caused CWL to obtain a line of credit to purchase lumber that PWP took possession of and processed, after which PWP resold the product back to CWL. (R. Doc. 11-5). In addition, Defendants caused CWL to obtain a Hurricane Ida Loan from First Guaranty Bank and then transferred those funds by check from CWL to PWP. (R. Doc. 11-6). This conduct depleted CWL's capital and constitutes impermissible self-dealing at CWL's expense.

*Deceptive Domain Name Redirection*:[1] Most egregiously, Defendant Brett Price redirected CWL's longstanding website, www.cypresswood.net, to a domain registered to PWP, https://cypresswood.net. (Exhibit 1, ¶ 33; *see also* screen shots contained in the First Amended Verified Complaint, Rec. Doc. 7). This unauthorized rerouting diverted CWL's customers and goodwill directly to PWP, misled consumers seeking CWL products, and eliminated CWL's online presence and search engine visibility. (Exhibit 1, ¶ 34). Such conduct not only undermines CWL's brand identity but also evidences Brett Price's intent to usurp CWL's business opportunities for his competing enterprise.

Taken together, this conduct reflects a wholesale abdication of Defendants' fiduciary obligations. Rather than act in CWL's best interests, Defendants systematically diverted corporate assets, business opportunities, and goodwill for personal gain. These repeated breaches of fiduciary duty warrant judicial intervention, including the preliminary injunctive relief sought, to preserve CWL's assets and prevent further harm.

---

[1] These acts also form the basis for the trademark infringement claim and violation of CFAA, which are addressed in greater detail *infra*.

### B. Trademark Infringement

There are two elements to a successful infringement claim under the Lanham Act. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235-36 (5th Cir. 2010). "The plaintiff must first establish ownership in a legally protectible mark, and second, . . . show infringement by demonstrating a likelihood of confusion." *Id.* (citing *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008)).

#### 1. "Cypress Wood & Lumber" and Cypresswood.net are legally protectible marks.

Cypress Wood & Lumber and cypresswood.net ("Marks") are legally protectible descriptive marks. *See, e.g.*, *LARUS Cloud Serv. Ltd. v. Laruscloudservices.net*, 2020 U.S. Dist. LEXIS 148426, at *9 (E.D. Va. Mar. 20, 2020) (finding continuous use of the mark, logo, and domain name for several years was sufficient to establish trademark rights in each); *Est. of Nissan v. Nissan.Com*, 2024 U.S. Dist. LEXIS 71933, at *10 (E.D. Va. Jan. 31, 2024) (use of NISSAN.COM domain name to advertise services and to communicate with customers and others through email addresses using the NISSAN.COM domain name sufficient to create protectable trademarks in each); *In re Eilberg*, 49 USPQ2d 1955 (TTAB 1998) (A domain name can be registered as a service mark if it functions as a source identifier); *In re CyberFinancial.Net, Inc.*, 65 USPQ2d 1789 (TTAB 2002) (suggesting a descriptive domain name that has acquired secondary meaning is protectible). Descriptive marks may acquire secondary meaning from exclusive and continuous use in commerce for five years or more. *See* Section 2(f) of the Trademark Act (15 U.S.C. § 1052(f)) .

In this case, CWL has exclusively and continuously used the Marks for at least five years to advertise its products and services, which include the sale of finished wood products, raw

lumber, and kiln drying services, as well as to communicate directly with consumers with email addresses containing the domain name. (*See, e.g.*, **Exhibit 19**, Boyd Second Supp_111-115) (invoices showing email addresses and sales of various species of wood and cuts). Consumers have come to recognize cypresswood.net as a source identifier for Cypress Wood & Lumber, LLC.

**2. CWL owns the "Cypress Wood & Lumber" trademarks.**

CWL owns the Cypress Wood & Lumber marks. The central issue to ownership here is simply use of the mark. Under Louisiana law, "[s]ubstantive rights in a trade name may be acquired only by actual usage." *S. U. System Found. v. Henderson*, CV 14-00288- JJB-RLB, 2016 WL 5796898, at *5 (M.D. La. Oct. 3, 2016). Likewise, federal courts have recognized that "[a] mark need not be registered in order to obtain protection because '[o]wnership of trademarks is established by use, not by registration.'" *Bd. of Supervisors for Louisiana State U. Agric. and Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008) (citing *Union Nat. Bank*, 909 F.2d at 842).

In this case, CWL has not only continuously used the marks to market and sell its various wood products and services for more than five years, it has *exclusively* used the Marks since their creation up until 2025, when Defendants hijacked CWL's domain. (Exhibit 19).

**3. Diversion of consumers from CWL's website to its own is likely to cause confusion as to the origin of the products sold.**

The Fifth Circuit examines several non-exhaustive factors in evaluating likelihood of confusion, which include: "(1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. No factor is dispositive, and the factors may weigh differently from case to case, depending on the particular facts and circumstances involved." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009).

The domain name used by PWP is identical to CWL's registered domain name in its entirety, less the preceding "www." On the Internet, where visual and textual cues are paramount and consumers rely heavily on exact matches for search and navigation, such similarity is particularly likely to create the impression that PWP's website is affiliated with, sponsored by, or endorsed by CWL. *See In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198 (TTAB 2009) (finding high likelihood of confusion where domain name mirrored a registered mark). PWP offers the same type of wood products, and the businesses share overlapping customers and marketing channels. The bad faith redirection of customers from CWL's website to Defendant's site creates a direct pipeline for diverting business opportunities and demonstrates both likelihood of confusion and intent to trade on CWL's goodwill. *Register.com v. Verio*, 356 F.3d 393, 397–400 (2d Cir. 2004).

CWL has been using the mark *cypresswood* for far more than five years, and the mark therefore has acquired secondary meaning. The records show that Price (individually) never had used the domain name in the *bona fide* offering of any goods or services. The bad faith intent can be inferred - by redirecting users seeking CWL's website to a business he separately owns, Price is exploiting the CWL's trade name and associated goodwill to capture customer traffic intended for CWL. The consumers are misled at the outset and diverted to a competitor through misuse of a mark or domain. This diversion trades on CWL's reputation and interferes with its ability to control its brand identity online. Because the domain name functions as a trademark and a key identifier of CWL's services and customer relationships, Price's unauthorized redirection is likely to cause confusion, loss of goodwill, and damage to CWL's reputation — injuries that support injunctive relief under the Lanham Act.

The way the diversion occurs further demonstrates a likelihood of confusion and intentional misconduct. Plaintiff discovered the rerouting while viewing what appeared to be an

active website for Cypress Wood & Lumber. The site included a prominent blue "Website" button — a feature customers would naturally use to inquire about products or place orders. When clicked, however, the button redirected users to Price's PWP website. This design funnels customers who believe they are contacting CWL directly into Price's competing business, creating classic initial interest confusion and a high risk of actual confusion. Consumers attempting to engage with CWL are instead delivered to PWP, who are positioned to capture those business opportunities. Embedding such a redirect within a customer-facing "website" feature demonstrates intent to divert trade and strongly supports a finding of likely confusion under the Lanham Act.

Tellingly, even Price struggled to explain away the confusion. In deposition, he resorted to an implausible analogy—suggesting consumers might expect to be taken to a Chevy website when typing in www.fordmotorcompany.com. (PWP Depo. 218:12–25).

Finally, Defendants' intent is undeniable. Price, a 50% member and manager of CWL, is fully aware of CWL's history, ownership, and established goodwill. Yet he deliberately diverted Internet traffic from CWL's longstanding domain, www.cypresswood.net, to a nearly identical domain, https://cypresswood.net, for use by his competing business, PWP. Tellingly, on the date of the sale, Price contemplated "taking Cypress Wood & Lumber and becoming completely Price's Wood Product's" as early as the date of the sale, June 17, 2020. This further reveals his intent to subsume CWL within PWP, unbeknownst to Boyd. (PWP Depo. 224:13-24).

By providing goods and services identical to those provided under CWL's mark, Defendants sought to capitalize on CWL's reputation and misappropriate its goodwill. Accordingly, CWL is likely to success on its trademark infringement claim.

**C. Computer Fraud and Abuse Act**

To prevail on a claim under CFAA, CWL must prove: (1) damage; (2) loss; (3) the

involvement of a "protected computer"; (4) use of the computer without authorization or in excess of authorization; and (5) the misuse of the computer was made knowingly and with the intent to defraud. *Frees, Inc. v. McMillian*, No. 05-1979, 2006 U.S. Dist. LEXIS 111857, at *6-7 (W.D. La. Jan. 17, 2006). CWL is likely to succeed because the evidence shows Price intentionally caused unauthorized or excess-authority access to protected systems used to control CWL's domain, resulting in damage and loss under 18 U.S.C. § 1030.

CWL has operated under the domain name cypresswood.net since at least 2012. (PWP Deposition 211:1-3). For two decades, CWL used the domain as its primary online identity, conducted sales through it, and paid the registration and maintenance fees, exercising uninterrupted control until the events giving rise to this litigation.

The June 17, 2020, Asset Sale between Williams and AWS did not include CWL's intangible property (*i.e.*, the domain cypresswood.net). (Exhibit 7, BDI_248-251). The corporate resolution for the sale of membership interests in CWL to BDI, executed by Williams, similarly did not include the domain. (Exhibit 8, BDI_254). Finally, the resolution signed by Brett and Brandi Price transferring 100% membership interests in CWL to Brett Price likewise did not include the domain. (Exhibit 9, BDI_252-253). Accordingly, the domain name remained the property of CWL.

Defendants nonetheless rely on a June 17, 2020, "Bill of Sale" produced with their Rule 12 motion. (R. Doc. 26-2). The document states that CWL "sell[s] and bequeath[s] its website, listed under the domains of Specialtylumber.net and/or Cypresswood.net to Brett Price" for $10.00. **(Exhibit 20).** On its face, that document purports to transfer website content—not the domain name itself. (*Id.*) Despite CWL's continuous use of the domain, Price only now claims personal ownership based on a one-page document he produced during this litigation even though

CWL has always paid for and controlled the domain. (PWP Depo. 224:61-12). Price never used the domain personally, never asserted ownership prior to litigation, and never informed Boyd or CWL that he believed the domain belonged to him.

Price also confirmed his understanding that a domain and a website are distinct: "A domain is basically like a -- an apartment complex that someone would own and a website would be like the contents inside of the apartment complex." (PWP Depo. 212:21-24) That testimony is inconsistent with Price's claim of domain ownership—at most, he claims the contents, not the complex.

In 2025, Price unilaterally contacted CWL's IT vendor—whose services CWL paid for—and instructed the vendor to reroute cypresswood.net so visitors were redirected to Price's separately owned company, PWP. (PWP Depo. 222:19-25; 223:1-4; 227:17-25; 228:1-17). Price did not inform Boyd, did not obtain CWL authorization, and did not disclose that he was acting for PWP. (*Id.*) The rerouting deprived CWL of its online presence and disrupted customer access, causing immediate harm and prompting this suit to restore the longstanding status quo: CWL's exclusive control and use of cypresswood.net.

**1. The purported "sale" document did not transfer a domain name.**

Courts treat domain names as distinct intangible property, separate from websites. *Kremen v. Cohen*, 337 F.3d 1024, 1030–31 (9th Cir. 2003). Ownership disputes turn on the expressed terms of the operative document, not post hoc inferences. *Domain Protection*, 23 F.4th 529 (5th Cir. 2022). Here, the "Bill of Sale" references a "website" "listed under" certain domains—not the domain name itself. That distinction matters because control of the domain is the valuable property interest, and diverting traffic through it constitutes unauthorized interference with CWL's asset. *Kremen*, 337 F.3d at 1030–31.

**2. Price induced unauthorized access or excess-authority access to protected systems.**

The CFAA prohibits accessing a protected computer "without authorization" or "exceeding authorized access." 18 U.S.C. § 1030(a)(2), (a)(4), (a)(5). Domain registrar systems, DNS dashboards, and domain-management portals qualify as "protected computers" because they are internet-connected and used in interstate commerce. Price exceeded any permissible authority by directing CWL's IT vendor—whose access existed solely for CWL's benefit—to reroute CWL's domain to his competing business. (PWP Depo. 209:12-21; 213:17-26 – 214:1-17). Using legitimate access for an improper purpose can constitute exceeding authorized access. *United States v. John*, 597 F.3d 263, 272–73 (5th Cir. 2010). This Court has applied *John* to hold that misuse of employer-provided access for personal gain or to harm the employer violates the CFAA. *Amedisys, Inc. v. King*, 2011 WL 1459197, at *4 (M.D. La. Apr. 15, 2011).

**3. Altering DNS/registrar settings caused actionable "damage" and "loss."**

The CFAA defines "damage" as "any impairment to the integrity or availability of data." 18 U.S.C. § 1030(e)(8). Rerouting DNS settings and impairing CWL's control over the domain necessarily impairs availability and integrity. The CFAA defines "loss" to include response costs, lost revenue, and business interruption. 18 U.S.C. § 1030(e)(11). CWL suffered those harms when customers were diverted and CWL's online presence was disrupted. (PWP Depo. 209:12-21; 213:17-26 – 214:1-17).

The Supreme Court has emphasized that authorization is defined by the system owner's permissions—not a user's title or general access. *Van Buren v. United States*, 593 U.S. 374, 383–84 (2021). Even if Price had general managerial authority within CWL, that authority did not include diverting a core company asset to a competing enterprise for personal benefit. (PWP Depo. 222:19-25; 223:1-4; 227:17-25; 228:1-17). Under *Van Buren*, Price's conduct constitutes

unauthorized or exceeding-authorized access and supports injunctive relief to prevent further diversion.

**4. Rerouting also constitutes conversion/interference with CWL's intangible asset.**

Courts recognize conversion of intangible property, including domain names. *Kremen*, 337 F.3d at 1030–31. Courts also recognize that unauthorized control over domain-related resources can interfere with a company's customer relationships and economic interests. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 397–400 (2d Cir. 2004). By causing CWL's domain traffic to be routed to PWP, Price deprived CWL of control over its online identity, impeded CWL's ability to interact with existing and prospective customers, and diverted economic opportunities to his own enterprise. (*Id*.). That ongoing interference further supports preliminary injunctive relief.

**D. Louisiana Unfair Trade Practices Act**

The alleged breach of fiduciary duties is conduct that falls under LUPTA's coverage. The U.S. Fifth Circuit has recognized that causes of action under LUPTA "often involve breaches of ethical standards arising from the employer-employee relationship." *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993). Federal district courts applying Louisiana law have found that "the question of breach of fiduciary duty or loyalty as an employee collapses into the question of whether the employee's actions constitute unfair trade practices." *Restivo v. Hanger Prosthetics & Orthotics, Inc.*, 483 F. Supp. 2d 521, 535 (E.D. La. 2007); *Ruby Slipper Cafe, LLC v. Belou*, No. 18-1548, 2019 U.S. Dist. LEXIS 44728, 2019 WL 1254897, at *7 (E.D. La. Mar. 19, 2019); *see also Defcon, Inc. v. Webb*, 687 So. 2d 639, 643 (La. App. 2 Cir. 1997).

Additionally, courts have found that the same conduct making up CFAA violations can be the basis for a LUPTA claim. *Pyramid Instrumentation & Elec. Corp. v. Hebert*, No. 17-1358, 2018 U.S. Dist. LEXIS 63105, 2018 WL 1789325, at *5 (W.D. La. Mar. 14, 2018), report and

recommendation adopted, No. 17-1358, 2018 U.S. Dist. LEXIS 63139, 2018 WL 1788621 (W.D. La. Apr. 13, 2018) (finding that allegations to support a "viable" CFAA claim could also support a LUPTA claim); *see also Elliott Co. v. Montgomery*, No. 15-02404, 2016 U.S. Dist. LEXIS 148523, 2016 WL 6301042, at *6 (W.D. La. Sept. 28, 2016), report and recommendation adopted, No. 15-2404, 2016 U.S. Dist. LEXIS 148523, 2016 WL 6301106 (W.D. La. Oct. 26, 2016) (finding that a plaintiff plausibly pleaded a LUPTA claim based on alleged CFAA violations). Because Plaintiff has established a likelihood of success on the merits of its breach of fiduciary and CFAA claims, Plaintiff is likewise to succeed under its LUPTA claim.

## III. THE PRICE DEFENDANTS' ACTIONS CREATE A SUBSTANTIAL THREAT OF IRREPARABLE HARM TO CWL IF A PRELIMINARY INJUNCTION IS NOT GRANTED.

The second factor in determining whether a preliminary injunction should issue is whether there is a substantial threat of irreparable harm to the plaintiff. In cases where monetary compensation cannot remedy the plaintiff's injury, the Fifth Circuit has found the injury irreparable. *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981).

### A. Fiduciary Duty

CWL respectfully moves for a preliminary injunction to prevent further dissipation and misuse of CWL's assets by Defendants. The record reflects a sustained pattern of self-dealing, concealment, and diversion of corporate resources to benefit separately owned businesses—conduct that threatens not only CWL's finances but its ability to function as a transparent and accountable enterprise. Courts recognize that fiduciary misconduct inflicts harm beyond immediate monetary loss by undermining governance, transparency, and business viability. *See, e.g.*, *Ebert v. Dejoria (In re Latitude Sols., Inc.)*, 922 F.3d 690, 697 (5th Cir. 2019); *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 290 (5th Cir. 2007). Immediate relief is necessary to

preserve the status quo and prevent escalation pending final adjudication.

More specifically, Defendants' obstruction of oversight and concealment of financial information deprive Boyd of timely access to information necessary to monitor CWL's finances and operations. That loss of transparency enables continued misappropriation and, once records are altered, destroyed, or concealed, cannot be meaningfully remedied after the fact. *See, e.g., Gilscot-Guidroz Int'l Co., Inc. v. Milek*, No. 24-1409, 2024 U.S. Dist. LEXIS 105963, at *30 (E.D. La. June 3, 2024).

Defendants' diversion of CWL's assets, credit, and business opportunities likewise threatens permanent loss of customers and goodwill—intangible injuries that are difficult to quantify and not readily compensable in money damages. *See, e.g.*, *Innovative Manpower Sols., LLC v. Ironman Staffing, LLC*, 929 F. Supp. 2d 597, 620 (W.D. La. 2013); *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989); *Gilscot-Guidroz Int'l Co., Inc.*, 2024 U.S. Dist. LEXIS 105963, at *25. When fiduciaries act in bad faith and prioritize self-interest, the resulting instability and loss of trust further impair the business in ways damages cannot fully cure. *See, e.g., Expedited Freight, LLC v. Feichter*, No. 3:25-cv-172, 2025 U.S. Dist. LEXIS 179546, at *28 (S.D. Tex. Aug. 4, 2025). Accordingly, immediate injunctive relief is warranted to halt Defendants' misconduct, protect CWL's assets and goodwill, and safeguard Boyd's rights as a member and fiduciary beneficiary.

**B. Trademark Infringement**

In the Fifth Circuit, once a plaintiff shows a likelihood of confusion, irreparable harm is presumed and an injunction is warranted because money damages are inadequate to remedy ongoing infringement. *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013); *see also Reservoir, Inc. v. Truesdell*, 1 F. Supp. 3d 598, 616 (S.D. Tex. 2014). Congress codified this

presumption in the Trademark Modernization Act. See 15 U.S.C. § 1116(a).

Irreparable injury also arises when infringement deprives the trademark owner of control over the quality of goods or services offered under the mark. Acme Refrigeration, 961 F. Supp. at 938–39; *see Quantum Fitness Corp. v. Quantum Lifestyle Ctrs. L.L.C.*, 83 F. Supp. 2d 810, 813 (S.D. Tex. 1999).

Here, the identity between CWL's mark/domain and Defendants' use of cypresswood.net creates an imminent risk of consumer confusion and false affiliation. CWL has built substantial goodwill under the "Cypress Wood & Lumber" mark, yet it has no control over the quality of goods and services offered through Defendants' infringing site. Without injunctive relief, Defendants' diversion of internet traffic and exploitation of CWL's brand will continue, thereby causing ongoing harm to CWL's goodwill and reputation that cannot be cured by damages. *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008). The Fifth Circuit likewise recognizes that trademark infringement—particularly involving online diversion—causes reputational harm and customer confusion that monetary relief cannot adequately address, making injunctive relief essential to restore marketplace clarity. *Streamline Prod. Sys. v. Streamline Mfg.*, 851 F.3d 440 (5th Cir. 2017).

**C. Computer Fraud & Abuse Act**

CWL has also shown irreparable harm stemming from the diversion of customer transactions, the erosion of consumer trust and goodwill, and trademark infringement. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Sw. Airlines Co. v. Kiwi.com, Inc.*, No. 3:21-cv-00098-E, 2021 U.S. Dist. LEXIS 187768, at *21 (N.D. Tex. Sept. 30, 2021).

Here, the nature of Defendants' misconduct renders the injury ongoing and difficult to quantify. By diverting traffic from CWL's legitimate website to a server under his control, Brett Price undermines CWL's ability to reliably communicate with customers, disrupts customer-facing operations, and diminishes CWL's market position. The resulting harm—loss of goodwill, reputational injury, and impaired competitive advantage—is not readily compensable through money damages. Because this injury extends beyond immediate financial loss to the integrity of CWL's systems, operations, and customer relationships, legal remedies are inadequate. Immediate injunctive relief is therefore necessary to preserve the status quo and prevent further harm.[2]

## IV. THE THREATENED INJURY TO CWL OUTWEIGHS ANY HARDSHIP TO DEFENDANTS.

The third factor requires CWL to show that the irreparable harm it faces absent injunctive relief outweighs any hardship a preliminary injunction would impose on Defendants. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). In cases involving intellectual-property misuse and related misconduct, this inquiry is closely tethered to irreparable harm: where the plaintiff demonstrates ongoing, non-compensable injury, the balance of hardships ordinarily favors injunctive relief. *See, e.g.*, *Petro Franchise Sys., LLC v. All Am. Props., Inc.*, 607 F. Supp. 2d 781, 797 (W.D. Tex. 2009) (balance of harms "easily satisfied" where plaintiff established irreparable harm); *S. Snow Mfg. Co., Inc. v. SnoWizard Holdings, Inc.*, Civ. A. No. 06-9170, 2014 WL 1652436, at *7 (E.D. La. Apr. 24, 2014) (balance tips in plaintiff's favor where plaintiff lacks protection from future infringement absent an injunction).

Here, the threatened harm to CWL is substantial and ongoing. Defendants' conduct—misappropriating CWL's trademark, diverting customers and web traffic, and interfering with

[2] For the same reasons the trademark infringement and CFAA claims create a risk of substantial threat of irreparable harm, so too does the continued violations of the LUTPA.

CWL's business operations and corporate assets—inflicts injury that is difficult to quantify and not fully remediable through money damages. Absent an injunction, CWL remains exposed to continuing customer confusion, erosion of goodwill and loss of prospective business opportunities—harms that strike at the core of CWL's competitive position and the integrity of its operations.

By contrast, the hardship to Defendants is minimal and self-inflicted. The requested injunction is narrowly tailored to stop ongoing violations of CWL's rights and to preserve the status quo: it would prohibit Defendants from using CWL's marks, domain, and other CWL-controlled assets and from continuing the diversionary conduct and unauthorized access or interference. It would not prevent Defendants from operating their separate business with PWP owed property or compete lawfully under their own branding and marketing channels. At most, Defendants would lose the ability to profit from conduct that is alleged to be unlawful—continued use of CWL's marks and misuse of CWL assets, systems, and infrastructure. That is not a cognizable hardship in equity.

Accordingly, because CWL faces ongoing and irreparable injury across its claims if relief is denied—and because Defendants will suffer little to no legitimate hardship by being ordered to comply with the law—the balance of equities decisively favors CWL.

## V. GRANTING A PRELIMINARY INJUNCTION WILL NOT DISSERVE THE PUBLIC INTEREST.

The fourth factor is whether the requested injunction would disserve the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). In infringement and unfair-competition cases, the public interest generally favors preventing consumer confusion and protecting trademark rights because trademark protection promotes fair competition and reliable marketplace information. *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812 n.1 (5th Cir. 1989); *San*

*Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 531, 537 (1987); *Moore Bus. Forms, Inc. v. Seidenburg*, 619 F. Supp. 1173, 1185 (W.D. La. 1985).

Those considerations apply here. Domain hijacking and diversion of CWL's online presence undermine consumer trust in online commerce and risk misleading customers; restoring rightful control and halting diversion serves the public interest. *See Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*, 23 F.4th 529 (5th Cir. 2022). The public interest likewise supports enforcing fiduciary duties and corporate accountability to prevent ongoing misuse of company assets and continued disruption of CWL's customer relationships and goodwill. *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 312 (5th Cir. 2008). Accordingly, this factor weighs in favor of injunctive relief.

**CONCLUSION**

For the reasons set forth herein, CWL respectfully submits that it has met its burden of demonstrating (1) a substantial likelihood of success on the merits; (2) the substantial threat of irreparable harm; (3) the balance of hardships decidedly tips in their favor; and (4) the issuance of a preliminary injunction order would be in the public interest. Therefore, the narrowly tailored preliminary injunction order sought by CWL is appropriate to protect the status quo until there is a final determination, at trial, as to whether a permanent and broader injunction should issue.

Respectfully Submitted:

INTELLECTUAL PROPERTY CONSULTING, LLC

/s/ Kristen L. Burge
Gregory D. Latham, Bar No. 25955
Kristen L. Burge, Bar No. 35686
400 Poydras Ave, Ste. 1400
New Orleans, Louisiana 70170
Phone: (504) 322.7166
glatham@iplawconsulting.com

kburge@iplawconsulting.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day of February 6, 2026, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record who are registered to receive electronic service through the Court's system.

/s/Kristen Burge
Kristen L. Burge